IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DANIEL HURLBUT                                                    PLAINTIFF

            v.                  Civil No.  5:17-cv-05234

SHERIFF TIM HELDER; KARAS                              DEFENDANTS
MEDICAL TEAM; DR. KARAS;
NURSE VERONICA DOCKERY;
NURSE KEN HUGHES; NURSE
LANDON HARRIS; NURSE REGINA
WALKER; LIEUTENANT FOSTER;
DEPPUTY JOSVE VELASCO; DEPUTY
SKINKIS; and DEPUTY URIEL PARADES

## MEMORANDUM OPINION AND ORDER

This is a civil rights action brought by Plaintiff Daniel Hurlbut pursuant to 42 U.S.C. §

1983 contending that his constitutional rights were violated while he was incarcerated in the

Washington County Detention Center (WCDC).  Plaintiff proceeds *pro se* and *in forma pauperis.*

Plaintiff maintains that his constitutional rights were violated in the following ways:  (1)

he was denied adequate care for serious medical and mental health needs; (2) he was denied access

to the courts; (3) Defendants failed to protect him from attack by fellow inmates; (4) he was

subjected to unconstitutional conditions of confinement; and (5) he was denied access to the

grievance procedure.  Plaintiff has named as Defendants Sheriff Tim Helder,[1] the Karas Medical

Team, Dr. Karas, Nurse Veronica Dockery, Nurse Ken Hughes, Nurse Landon Harris, Nurse

Regina Walker, Lieutenant Foster, Deputy Josve Velasco, Deputy Skinkis, and Deputy Uriel

Parades.

---

[1] Plaintiff is asserting only official capacity claims against Sheriff Helder.  (ECF No. 47-11 at 27-29).

The case is before the Court on Plaintiff's Motion for Partial Summary Judgment on the failure to protect claim against Deputies Skinkis and Velasco (ECF No. 41), the Defendants Motion for Summary Judgment (ECF No. 45), and Plaintiff's Motion for Summary Judgment (ECF No. 49) on all claims. The parties have also filed responses and replies.

## I. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. BACKGROUND

Plaintiff was booked into the WCDC on January 3, 2016. (ECF No. 47-2 at 2). On September 8, 2016, Plaintiff was transferred to the Arkansas State Hospital (ASH) in accordance with an order entered in his criminal case. (*Id.* at 7-10). He remained there until November 7, 2016, when he returned to the WCDC. (*Id.* at 11-12).

During the time he was in the WCDC, Plaintiff was transferred for short periods of time to other facilities for court proceedings. These transfers include the following: On February 8, 2016, Plaintiff was booked into the Madison County Detention Center for Court (ECF No. 49 at 54). He was transported back to the WCDC the following day. (*Id*). On April 3, 2016, Plaintiff was booked into Madison County for court. (ECF No. 49 at 58). On April 4th, 2016, Plaintiff was released to the WCDC. (*Id*). On April 11, 2016, Plaintiff was booked into Madison County for court. (ECF No. 49 at 60). On April 12th, 2016, Plaintiff was transferred back to the WCDC. (*Id*). On May 9, 2016, Plaintiff was booked into Madison County. (ECF No. 49 at 62). He was transferred back to the WCDC the following day. (*Id*). On June 29, 2016, Plaintiff was released to Benton County for court on June 30th. (ECF No. 49 at 57). Plaintiff maintains that there were at least nine separate occasions when he suffered an interruption of medication because of his transport to another location. (ECF No. 49 at 3).

On March 21, 2017, Plaintiff a negotiated plea on multiple charges. He was sentenced to serve a total of 120 months in the Arkansas Department of Correction (ADC). On April 10, 2017, Plaintiff was transferred to the ADC. (ECF No. 47-2 at 13).

## III. DISCUSSION

Section 1983 does not create substantive rights. *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). Instead, it provides remedies for deprivations of rights established by the Constitution or

the laws of the United States. *Id.* Two elements are required to establish a claim under § 1983. These elements are: (1) the deprivation of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was committed "under color" of state law. *Lugar v. Edmondson*, 457 U.S. 922, 931 (1982).

### (A). Denial of Adequate Medical and Mental Health Care

### (1). Relevant Facts

WCDC makes emergency medical services available to detainees twenty-four hours a day. (ECF No. 47-1 at 2).[2] Officers are trained to provide temporary lifesaving care until Emergency Medical Services or other medical personnel arrive. (*Id*). Detainees may submit medical complaints via electronic kiosk for daily review by qualified medical personnel. (*Id*). Nursing staff is responsible for checking the files of inmates under the medical provider's care and following all physician's orders. (*Id*).

"Since January 1, 2016, Dr. Rob Karas has been the Jail Medical Doctor and Karas Correctional Health has provided all medical care in the [WCDC] pursuant to a contract with Washington County." (ECF No. 47-1 at 4). All decisions regarding medical care are made by the contract medical staff. (*Id*). "No employee of [WCDC] is authorized to make non-emergency medical decisions on behalf of any inmate. . . . ***All decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the physician at the detention facility***." (*Id*)(emphasis in original).

According to Dr. Karas, when Plaintiff was booked in on January 3, 2016, the only medication listed was Gabapentin[3] and Plaintiff did not have it with him. (ECF No. 47-2 at 1-2).

---

[2] Washington County's written policy regarding the provision of medical, dental, and psychiatric care is located at ECF No. 47-10. All citations to the summary judgment record will be to the CM/ECF docket and page number.

[3] Gabapentin is used to " help control certain types of seizures in people who have epilepsy" and "to relieve pain of postherpetic neuralgia." https://medlineplus.gov/druginfo/meds/a694007.htm (accessed November 30, 2018).

On January 22, 2016, Plaintiff's mother delivered the following medications to the WCDC: Florinef,[4] .1 mg as needed; Olanzapine,[5] one 10 mg tablet at bedtime; Venlafaxine,[6] one 150 mg tablet per day; Prednisone,[7] one 20 mg tablet per day; and Gabapentin, one 600 mg tablet in the morning and two tablets at night.  (*Id.* at 3).

After he was booked in, Plaintiff testified that he was suffering from opiate withdrawal symptoms.  (ECF No. 47-11 at 61).  Plaintiff testified that at this point in his life he "was so bad on opiates" that he was "spending more than $500 every single day just for opiates."  (ECF No. 62 at 24-25).  Withdrawal made him feel like he had a severe case of the flu.  (ECF No. 47-11 at 61).  Plaintiff testified he thought he was going to die.  (*Id*).  He felt like that for months.  (*Id*).  Plaintiff testified that it was the most miserable time "I've ever experienced in my life."  (*Id*).

Dr. Karas indicates that at intake Plaintiff reported being on Ambien,[8] Hydrocodone,[9] Effexor,[10] Gabapentin, Methocarbamol,[11] and other medications he could not recall the names of.  (ECF No. 47-12 at 2).  According to Dr. Karas, on the day Plaintiff was booked in, Plaintiff was put on a "detox screen" for narcotic pain medication.  (ECF No. 47-12 at 2).  There is no precise

---

[4] Florinef is the brand name for the drug Fludrocortisone Acetate.  This drug "is used to  help control the amount of sodium and fluids in your body."  It is used to treat "syndromes where excessive amounts of sodium are lost in the urine.  https://medlineplus.gov/druginfo/meds/a682549.html (accessed November 30, 2018).

[5] Olanzapine is used to "treat symptoms of schizophrenia" and "bipolar disorder… [I]t is in a class of medications called atypical antipsychotics."  https://medlineplus.gov/druginfo/meds/a601213.html (accessed November 30, 2018).

[6] Venlafaxine is "used to treat depression."  The extended-release capsules "are also used to treat generalized anxiety disorder."  https://medlineplus.gov/druginfo/meds/a694020.html (accessed November 30, 2018).

[7] Prednisone "is used alone or with other medications to treat the symptoms of low corticosteroid levels (lack of certain substances that are usually produced by the body and are needed for normal body functioning."  In individuals with normal corticosteroid levels the medication is used to treat arthritis, severe allergic reactions, multiple sclerosis, lupus, and "certain conditions that affect the lungs, skin, eyes, kidneys, blood, thyroid, stomach, and intestines."  https://medlineplus.gov/druginfo/meds/a601102.html (accessed November 30, 2018).

[8] Ambien is the brand name for the drug Zolpidem.  Zolpidem is used to treat insomnia.  https://medlineplus.gov/druginfo/meds/a693025.html (accessed November 30, 2018).

[9] Hydrocodone is used to "relieve severe pain.  Hydrocodone is only used to treat people who are expected to need medication to relieve severe pain around-the-clock for a long time and who cannot be treated with other medications or treatments."  https://medlineplus.gov/druginfo/meds/a614045.html (accessed November 30, 2018).

[10] Effexor is the brand name for the drug Venlafaxine.  *See* n.6.

[11] Methocarbamol is used "with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  It is a muscle relaxant.  https://medlineplus.gov/druginfo/meds/a682579.html (accessed November 30, 2018).

explanation of what "detox screen" consists of. However, from Dr. Karas' affidavit, it appears it consisted of evaluating the patient's condition. (ECF No. 47-12 at 4-5). According to the medical records, the detox screen lasted from January 4, 2016, until January 8, 2016. (ECF No. 49 at 43).

On January 5, 2016, Plaintiff was started on Citalopram,[12] Trazodone,[13] Quetiapine,[14] and Gabapentin. (ECF No. 47-12 at 3). According to Dr. Karas, between January 3, 2016, and September 8, 2016, Plaintiff was seen twenty-two times on sick or "psyc" call, eight times on provider call, and his medical care was reviewed twenty-three times. (*Id*). Bloodwork was ordered on July 1, 2016, and the results were stable. (*Id*).

Dr. Karas indicates that narcotic pain medication is not routinely given at the WCDC. (ECF No. 47-12 at 3). The reasons for this are: narcotic pain medication has a high risk of diversion and abuse, a risk that is increased in the incarcerated population; receiving narcotic pain medication in the detention center can be a risk to the patient themselves, as other detainees may seek to divert the medication by coercion or force; and narcotic pain medication is not recommended for treatment of non-cancer pain, as it is not shown to improve outcomes. (*Id.* at 3-4).

Dr. Karas indicates that Plaintiff's chronic pain was treated with Gabapentin (dose gradually increased to 1600 mg twice daily), Naproxen,[15] Tylenol, Prednisone, and Venlafaxine. (ECF No. 47-12 at 3). Plaintiff was also given a second mattress for most of his stay at the WCDC.

---

[12] Citalopram is used to treat depression. https://medlineplus.gov/druginfo/meds/a699001.html (accessed November 30, 2018).

[13] Trazodone is used to treat depression. https://medlineplus.gov/druginfo/meds/a681038.html (accessed November 30, 2018).

[14] Quetiapine is used to treat the symptoms of schizophrenia and to treat bipolar disorder. https://medlineplus.gov/druginfo/meds/a698019.html (accessed November 30, 2018).

[15] Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis, and ankylosing spondylitis. "Nonprescription naproxen is used to reduce fever and to relieve mild pain from headaches, muscle aches, arthritis, menstrual periods, the common cold, toothaches, and backaches." https://medlineplus.gov/druginfo/meds/a681029.html (accessed November 30, 2018).

(*Id*).  Plaintiff was told to continue stretching and to try push-ups to build and maintain bone strength.  (ECF No. 47-2 at 15).

On January 17, 2016, Plaintiff's mother contacted the WCDC and advised that Plaintiff was detoxing from drugs and was afraid he might vomit in his sleep.  (ECF No. 49 at 16).  Deputy Heil went to speak with Plaintiff who stated he was detoxing from heroine and methadone.  (*Id*).  Plaintiff indicated he was afraid he would vomit in his sleep and suffocate.  (*Id*).  Plaintiff reported that both his wives had died this way.  (*Id*).  Plaintiff complained of chills, hot flashes, cramps, and bile in his throat as well as vomiting the past three days.  (*Id*).  Deputy Heil stated he would talk to the nurse about Plaintiff's situation.  (*Id*).  When Deputy Heil returned to B-pod control, he was told the nurse had already cleared Plaintiff.  (*Id*).  At evening medication pass, Plaintiff asked Deputy Heil what the nurse had said and was told the nurse had cleared him.  (*Id*).  Plaintiff replied that he had not talked to a nurse about the situation.  (*Id*).  The nurse present at medication pass briefly talked to the Plaintiff and told him to put a request in the kiosk.  (*Id*).

On January 25, 2016, after receipt of Plaintiff's medical records, Plaintiff was prescribed Florinef to treat his adrenal insufficiency.[16]  (ECF No. 47-12 at 4).  On February 1, 2016, Prednisone was added.  (*Id*).  On August 11, 2016, Plaintiff was changed to Hydrocortisone[17] therapy.  (*Id*).  According to Plaintiff, he was never received access to "stress dosing[18]" or an

---

[16] Individuals with"[a]drenal insufficiency do not have enough of the hormones cortisol and aldosterone.  Without the right levels of these hormones, your body cannot maintain essential life functions."  If the condition is permanent, daily medication must be taken.  Many medications may be used to replace cortisol including Hydrocortisone, Dexamethasone, or Prednisone.  Aldosterone may be replaced by the drug Fludrocortisone (Florinef).
https://www.cc.nih.gov/ccc/patient_education/pepubs/mngadrins.pdf (accessed December 3, 2018).
[17] Hydrocortisone "a corticosteroid, is similar to a natural hormone produced by your adrenal glands.  It is often used to replace this chemical when your body does not make enough of it."  It also relieves inflammation, arthritis, skin, blood, kidney, eye, thyroid, intestinal disorders, severe allergies, asthma, and certain types of cancer.
https://medlineplus.gov/druginfo/meds/a682206.html (accessed November 30, 2018).
[18] Stress dosing means doubling your usual hydrocortisone dose for one to three days.  This is done in response to physical stresses caused by illness.  https://www.cc.nih.gov/ccc/patient_education/pepubs/mngadrins.pdf (accessed December 3, 2018).

increased amount of steroid sometimes given in a shot.[19]  (ECF No. 49 at 7).  Plaintiff points to no periods of time when he believed either was necessary.  Rather, he believed they should be available to him.

Plaintiff was released from custody on September 8, 2016 and returned to the WCDC on November 7, 2016.  (ECF No. 47-12 at 4).  Plaintiff reported being on Klonopin,[20] Gabapentin, Hydrocortisone, Effexor, and other medications he could not recall the names of.  (*Id*).  He also reported a history of schizophrenia and manic depression.  (*Id*).

Plaintiff's medication reconciliation was completed on November 8, 2016.  (ECF No. 47-12 at 5).  Plaintiff was provided Hydrocortisone, Effexor, Omeprazole,[21] Gabapentin, and Bengay.  (*Id*).  Quetiapine was given instead of Olanzapine.  (*Id*).  "Soma,[22] Clonazepam, [and] Zolpidem[23] [were discontinued] as these are narcotic, benzodiazepine scheduled medications with chance for abuse."  (*Id*).  Lidocaine patches,[24] Fioricet,[25] and Salicylic Acid Wash[26] were also discontinued "as these are not recommended for long term use."  (*Id*).  Dr. Karas asserts that Fioricet "can have

---

[19] If someone with adrenal insufficiency is so ill he cannot take his medication in pill form, he must take a "glucocorticoid medication by injection.  The injection will take the place of both Hydrocortisone and Florinef."  https://www.cc.nih.gov/ccc/patient_education/pepubs/mngadrins.pdf (accessed December 3, 2018).

[20] Klonopin is the brand name for the drug clonazepam.  It is used to control certain types of seizures and to relieve panic attacks.  https://medlineplus.gov/druginfo/meds/a682206.html (accessed November 30, 2018).

[21] Omeprazole is used to treat symptoms of  gastroesophageal reflux disease (GERD), heartburn, and ulcers.  https://medlineplus.gov/druginfo/meds/a693050.html (accessed November 30, 2018).

[22] Soma is the brand name for the drug carisoprodol.  It is a muscle relaxer.  https://medlineplus.gov/druginfo/meds/a682578.html (accessed November 30, 2018).

[23] Zolpidem is used to treat insomnia.  https://medlineplus.gov/druginfo/meds/a693025.html (accessed November 30, 2018).

[24] Lidocaine patches are "used to relieve pain of post-herpetic neuralgia."  It is a local anesthetic that works by stopping nerves from sending pain signals.  https://medlineplus.gov/druginfo/meds/a603026.html (accessed November 30, 2018).  According to a note from Nurse Dockery entered on January 21, 2017, Lidocaine patches are not "available on our formulary."  (ECF No. 49 at 82).

[25] Fioricet is a brand name for a combination product containing Acetaminophen, Butalbital, and Caffeine.  It also comes as a combination that includes Codeine.  https://medlineplus.gov/druginfo/drug_Fa.html (accessed November 30, 2018).

[26] Salicylic Acid Topical is used to "prevent pimples and skin blemishes in people who have acne."  https://medlineplus.gov/druginfo/meds/a607072.html (accessed November 30, 2018).

an interaction with Hydrocortisone that lowers Hydrocortisone levels and could cause a life threatening adrenal crisis.[27]" (*Id*. at 7).

Dr. Karas further notes that Plaintiff was started on detox protocol for Klonopin on November 8, 2016. (ECF No. 47-12 at 5). Dr. Karas states that Plaintiff was evaluated on November 10, 2016 and was found to have "no acute signs or symptoms of withdrawal." (*Id.* at 5).

On January 2, 2017, nursing staff requested that Plaintiff be moved to booking with a "15 minute watch on him due to him having some health concerns." (ECF No. 49 at 77). Booking was determined not to be a suitable location. (*Id*). Sergeant Morse ordered an isolation cell in B-pod be cleared out for the Plaintiff. (*Id*).

Deputies Hudgens and Edens encountered difficulties in getting Plaintiff moved. (ECF No. 49 at 77-78). Plaintiff was vomiting and "appeared worked up in a state of anxiety. He said he felt he was being set up for being a martyr and was more afraid to be left alone." (*Id.* at 77). Plaintiff had good rapport with his cell mate Trey Monaco. (*Id*). With Monaco's help, Plaintiff was eventually moved to the isolation cell but was showing multiple signs of paranoid behavior. (*Id*). A short time later, Sergeant Morse was contacted by the nurse and told that her supervisor said the decision of where Plaintiff should be housed should be made by the detention supervisor. (*Id.*). Sergeant Morse determined that Plaintiff should be moved back to R-block with Monaco. (*Id*).

On February 13, 2017, Plaintiff was picked up and transported to Madison County for Court. (ECF No. 47-8 at 34). Plaintiff asked about his medications but was told that Nurse Walker had nothing to transport the medications of the various inmates with them. (*Id*). Instead, the

---

[27] On February 5, 2017, Plaintiff was advised that "we do not give Fioricet here, and it is contraindicated from chronic headaches, as it can make headaches worse." (ECF No. 49 at 112).

transport deputies were told that Madison County would have to have its medical staff call over to Washington County and Nurse Walker would provide them with the necessary information to obtain the medication. (*Id*).

Plaintiff remained incarcerated at the WCDC until April 10, 2017. (ECF No. 47-12 at 5-6). During this time, Dr. Karas asserts that Plaintiff was seen thirteen times on sick call, two times on "psyc" call, and five times on provider call. (*Id*. at 5). Further, Dr. Karas asserts that the plan for Plaintiff's medical care was evaluated twenty-three times. (*Id*). Bloodwork was ordered for further assessment on two different occasions, January 10, 2017, and February 24, 2017, and the labs were stable on both occasions. (*Id*). Dr. Maass, who specializes in endocrinology, was consulted on February 24, 2017, and "he confirmed [Dr. Karas's] plan of care and recommended that [Plaintiff's] Renin Level be checked as well. His recommendations for care were followed." (*Id*. at 6). Dr. Maass is the doctor identified by Plaintiff as his endocrinologist. (ECF No. 47-11 at 13). Although, Plaintiff testified he had not seen him since 2012. (*Id.* at 14).

Plaintiff was again booked into the WCDC on May 3, 2017 and remained there until May 23, 2017. (ECF No. 47-12 at 6). On intake, Plaintiff denied use of Benzodiazepines, narcotic pain medication, or Amphetamine use. (*Id*). As a result, he was not started on detox protocol. On May 4, 2017, Plaintiff was prescribed Gabapentin, Quetiapine, Magnesium, and Tums. (*Id*). On May 10, 2017, Plaintiff was prescribed Hydrocortisone and Venlafaxine. (*Id*). During this period of incarceration, Dr. Karas asserts that Plaintiff was seen once on sick call and his medical care was reviewed nine times by one of the providers. (*Id*).

In connection with Plaintiff's criminal case, a forensic examination was performed by Dr. Stephen Nichols on January 15, 2016. Dr. Nichols indicated Plaintiff met the criteria for "schizoaffective disorder, bipolar type, multiple episodes, currently in acute episode." (ECF No.

47-2 at 4). At the time of the examination, Dr. Nichols concluded that Plaintiff "lacked the capacity to understand the proceedings against him, and to assist effectively in his own defense." (*Id*).

Dr. Nichols noted that Plaintiff had a history of abuse of opiates including oxymorphone. (ECF No. 47-2 at 6). Plaintiff had been married twice and both wives death involved "drug ingestion." (*Id*). His second wife died on January 2, 2016. (*Id*). Plaintiff reported being on the Seroquel, Gabapentin, and Trazodone at the WCDC. (*Id*). Plaintiff indicated the medications made him calmer. (*Id*).

Considering Dr. Nichols' report, the Circuit Court of Washington County entered an order on March 2, 2016, committing the Plaintiff to the "custody of the Arkansas Department of Human Services, for detention, care, and treatment, until restoration of Defendant's fitness to proceed." (ECF No. 47-2 at 7-8). The ASH was directed to determine Plaintiff's mental condition and to prepare and submit "a written psychiatric or psychological report . . . indicating whether Defendant is fit to proceed, or, if not whether Defendant's mental disease or defect is of a nature precluding restoration of fitness to proceed, and also whether Defendant presents a danger to himself or to the person or property of another." (*Id.* at 8).

Medical records from the ASH indicate Plaintiff was admitted on September 8, 2016 and discharged on November 7, 2016. (ECF No. 47-4 at 48). Plaintiff's diagnoses on admission were borderline personality disorder, antisocial personality disorder, cannabis use disorder, opiate use disorder, adrenal insufficiency, back pain, and headaches. (*Id*). Note was made that the Plaintiff should not be prescribed opiates due to his history of drug abuse. (*Id*. at 49). The aftercare report dated November 4, 2016, concluded that Plaintiff needed medication management services to continue his psychiatric medication. (*Id.* at 50). Plaintiff's medications on discharge were:

Omeprazole, Hydrocortisone, Ambien, Salicylic Acid, Gabapentin, Bengay ultra strength, Lidocaine patch, Zyprexa,[28] Fioricet, Klonapin, Effexor XR, and Soma. (*Id.* at 52).

During his incarceration at the WCDC, Plaintiff submitted multiple medical requests dealing primarily with the following issues: his medication being changed; not being treated for withdrawal; asking why a White inmate got treated for withdrawal while Plaintiff, who is Hispanic did not get treated; his Gabapentin being discontinued; not receiving proper medication and blood tests for congenital adrenal hyperplasia; not being seen by his endocrinologist or psychiatrist; not being treated for chronic joint, back, sciatica, muscle pain, and arthritis, which caused him to suffer needlessly and made it difficult to control his aggression; his need for muscle relaxers (Soma and Methocarbamol); his need for a double mat due to his chronic pain; needing his prescription for Effexor for mood and psychosis stability due to his bi-polar and depression; his paranoia, insomnia, and "voices," and hallucinations were getting worse; his need for proper medical treatment following his having been attacked by fellow inmates; not being able to see the doctor; and his need for pain medication for his chronic back and joint pain. (ECF No. 47-3 at 1-48).

On March 7, 2016, Plaintiff was charged with a disciplinary violation for hoarding medication. (ECF No. 47-8 at 2-5). Plaintiff was given a pill nursing staff had cut. (*Id.* at 3). Plaintiff said he could not take that pill because he would not get the full amount. (*Id*). The nurse asked for the pill back to throw it away. (*Id*). Plaintiff did not return the pill and according to Deputy Hudgens attempted to hide the pill in his palm. (*Id*). Deputy Hudgens asked Plaintiff to dispose of the pill and he did so. (*Id*).

On August 30, 2016, Plaintiff was charged with hoarding his medication. (ECF No. 47-8 at 18). Jailer Josue Velasco was present at the evening medication pass. (*Id*). Jailer Velasco stated

---

[28] Zyprexa is the brand name for Olanzapine. *See* n.

he saw the Plaintiff dropping his medication down his pant leg and then pretending to take it. (*Id*). After Jailer Velasco had Plaintiff take both pant legs out of his socks, the medication fell to the ground and Plaintiff picked it up and took it. (*Id*). Plaintiff was found guilty based on Deputy Velasco's report and the video of the incident. (*Id.* at 19). Plaintiff could be seen picking something off the floor and then consuming it. (*Id*). He was given five days in disciplinary segregation. (*Id*).

On March 14, 2017, Plaintiff was booked into Benton County. (ECF No. 49 at 65). He was released on March 17th to the WCDC. (*Id*). Note was made that Plaintiff had is medications with him when released. (*Id*).

With respect to Sheriff Helder, Plaintiff argues he was aware of the policy of denying any medication that was not on Karas' formulary.[29] (ECF No. 62 at 1). Plaintiff further maintains Sheriff Helder knew of Plaintiff's psychiatric commitment and of Plaintiff's inability to obtain his medications when he was temporarily transferred to another facility but did nothing. (*Id*).

With respect to Dr. Karas, Plaintiff testified he should be liable for a failure to provide continuity of care whenever Plaintiff was transferred to another facility and then brought back to the WCDC. (ECF No. 62 at 36-37). Plaintiff also believed that Dr. Karas should not substitute his judgment for "specialist's such as a psychiatrist and an endocrinologist." (*Id.* at 37). Plaintiff testified that Dr. Karas "did not want to do the right blood work [ACTH stimulation testing] for my adrenal disease." (*Id*. at 42). Additionally, Dr. Karas did not provide Plaintiff with access to steroid shots for his adrenal disease. (*Id*). Plaintiff further testified that Dr. Karas "would repeatedly avoid seeing [him] for long periods of time." (*Id*). If Plaintiff, his family, or his lawyer made "enough noise and enough racket about it," Dr. Karas would see the Plaintiff "a bunch of

---

[29] A formulary is a "list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits."  https://www.healthcare.gov/glossary/formulary/ (accessed November 30, 2018).

times without doing [any]o medical things.  He would just come and see [the Plaintiff] for a few seconds and then go away."  (*Id*).

With respect to Nurse Veronica Dockery, Plaintiff testified she suddenly took him off Fioricet stating it was not on their formulary.  (ECF No. 62 at 43).  At the time, Plaintiff maintains the Fioricet was still on the cart but they would not give it to him.  (*Id*).  Plaintiff indicated that Nurse Dockery "seemed to not want [him] to see the doctor.  It was like she was trying to block [him] from seeing the doctor."  (*Id*).  She would either refuse his request or reply that he would be seen by the doctor but then Plaintiff was not seen. (*Id.*at  43-44).

Plaintiff testified that Nurse Landon Harris also seemed to "block" Plaintiff from seeing the doctor.  (ECF No. 62 at 44).  Nurse Harris replied to most of Plaintiff's requests.  (*Id*).  Nurse Harris either denied Plaintiff's requests or would indicate Plaintiff would be seen by the doctor and that never occurred.  (*Id*. at 46).

With respect to Nurse Regina Walker, Plaintiff testified that she also replied to his requests. (ECF No. 62 at 46).  Plaintiff believed she was trying to keep him from seeing the doctor.  (*Id*).

With respect to Nurse Ken Hughes, Plaintiff testified he was trying to figure out who this was.  (ECF No. 62 at 46).  Plaintiff states Nurse Hughes would respond to his grievances and requests.  (*Id*).  Plaintiff testified Nurse Hughes seemed to "have some significant control over [his] treatment."  (*Id*).  Plaintiff indicated Nurse Hughes had the "ability to keep [him] from seeing the doctor and to stop [his] sick calls or requests from getting where they needed to go."  (*Id*. at 46-47).

Medical records from Vantage Point indicate Plaintiff was admitted there on March 26, 2015 and discharged on April 1, 2015.  (ECF No. 47-4 at 1).  Plaintiff was diagnosed as bipolar, with depression being his most recent episode and psychotic features.  (*Id*. at 2).  He was to be

treated with Geodon[30] for psychosis and Lexapro[31] for depression. (*Id*). He was also started on Vitamin D3, Ambien, Prilosec,[32] Oxycodone/APAP,[33] Prednisone, Oxycontin CR,[34] Florinef, Flexeril, Solumedrol IM[35] for self-administration for adrenal emergency, and Bactrim.[36] (*Id*. at 4). Note was made that Plaintiff suffered from sciatica, rheumatoid arthritis in the back, and congenital adrenal hyperplasia. (*Id*).

Medical records from the University of Arkansas for Medical Sciences (UAMS) in December of 2013, indicate a DNA sequencing test was done, and the results were consistent with a "diagnosis of, or predisposition to developing, congenital adrenal hyperplasia (CAH)." (ECF No. 49 at 28). Records indicate Plaintiff was seen at the Springdale location of UAMS on September 4, 2015. (ECF No. 42 at 1). Note was made that Plaintiff had been previously diagnosed with congenital adrenal hyperplasia and chronic low back pain. (*Id*. at 6). It was also noted that Plaintiff's past psychiatric diagnoses were bipolar I with psychotic features, psychogenic non-epileptic seizures (PNES), and panic disorder. (*Id*). Dr. Rubenow indicated Plaintiff had a need for long term formal psychiatric follow-up due to his symptoms of bipolar disorder and panic disorder. (ECF No. 47-4 at 30). Plaintiff was also seen on October 12, 27,

---

[30] Geodon is the brand name for the drug Ziprasidone. Ziprasidone is used to treat symptoms of schizophrenia and bipolar disorder. https://medlineplus.gov/druginfo/meds/a699062.html (accessed December 6, 2018).

[31] Lexapro is the brand name for the drug Escitalopram. Escitalopram is used to treat depression and generalized anxiety disorder. https://medlineplus.gov/druginfo/meds/a603005.html (accessed December 6, 2018).

[32] Prilosec is the brand name for Omeprazole. Omeprazole is used to systems of gastroesophageal reflux disease (GERD). https://medlineplus.gov/druginfo/meds/a693050.html (accessed December 6, 2018).

[33] Oxycodone is used to relieve moderate to severe pain. https://medlineplus.gov/druginfo/meds/a682132.html (accessed December 6, 2018).

[34] Oxycontin is a brand name for Oxycodone.

[35] Solumedrol is the brand name for the drug Methylprednisolone Injection. This drug is used to treat severe allergic reactions. It is used in the management of multiple sclerosis, lupus, gastrointestinal disease, and certain types of arthritis. It is also used to treat certain conditions that affect the blood, skin, eyes, nervous system, thyroid, kidneys, and lungs. It is sometimes used in combination with other drugs to treat symptoms of low corticosteroid levels. https://medlineplus.gov/druginfo/meds/a601157.html (accessed December 6, 2018).

[36] Bactrim is the brand name for Co-trimoxazole a combination product containing Sulfamethoxazole and Trimethoprim. Co-trimoxazole is used to treat bacterial infections, such as pneumonia, and infections of the urinary tract, ears, and intestines.

2015, November 17 and 30, 2015, on December 21, 2015.  (ECF No. 47-4 at 7-8, 11, 16, 20, ).  Various changes were made to Plaintiff's medication during these visits.  (*Id.* at 7-37).

### (2).  Analysis of the Denial of Adequate Medical and Psychiatric Care

By their incarceration, inmates are completely dependent on prison authorities for their medical care.  *Estelle v. Gamble,* 429 U.S. 97, 103 (1976).  The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners.  *Id.* at 106.  The duty to provide medical care encompasses psychiatric needs.  *Vaughan v. Lacey,* 49 F.3d 1344, 1346 (8th Cir. 1995).  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical [or psychiatric] needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  *Hudson v. McMilliam*, 503 U.S. 1, 9 (1992).  "[T]he failure to treat a medical [or psychiatric] condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

Thus, to prevail on an Eighth Amendment claim, "[t]he [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but *deliberately* disregarded those needs.'"  *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (*quoting Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

No argument is made that Plaintiff did not have serious medical and psychiatric needs.  He has therefore met the objective prong.

To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is

akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

"The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Green Cty. Jail Emps*, 487 F.3d 1115, 1118 (8th Cir. 2007). The deliberate indifference standard applies only to a narrow band of conduct. Detention Center physicians are entitled to exercise their medical judgment, and "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Long*, 86 F.3d at 761. What medication should be prescribed involves the exercise of medical judgment. While Plaintiff's medications were changed by Dr. Karas, Plaintiff was not denied medication for his conditions. He merely was prescribed different medications than his free world doctors had prescribed. Plaintiff's medical records were obtained, and changes and/or additions were made to the medications being provided to Plaintiff.

With respect to Plaintiff's adrenal insufficiency, Plaintiff was provided medication, blood tests were run, an endocrinologist, the one identified by the Plaintiff as being involved in his treatment, was consulted, and the additional blood tests Dr. Maass suggested were done. The blood tests showed that Plaintiff's condition was stable. There is no indication that Dr. Karas chose a less efficacious course of treatment, intentionally maltreated the Plaintiff, or refused to provide essential care. *Smith v. Jenkins*, 919 F.2d 90, 92-93 (8th Cir. 1990). Further, whether Plaintiff should have been seen by an endocrinologist, rather than Dr. Karas consulting with an endocrinologist, is a question of medical judgment. *Cf. Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997)("[a]lthough the prison doctors may not have proceeded from their initial diagnosis to

their referral to a specialist as quickly as hindsight perhaps allows us to think they should have, their actions were not deliberately indifferent").

With respect to Plaintiff's chronic pain, he was not provided with any narcotic medications because they were not used at the facility on a regular basis. This was especially true in Plaintiff's case where he was addicted to opiates. Plaintiff was given Gabapentin to relieve the pain and the dosage was adjusted upwards based on Plaintiff's complaints that he continued to suffer from chronic pain. Plaintiff was also prescribed Methocarbamol and Naproxen was authorized to have Bengay. Tylenol was also available. For most of his stay at the WCDC, Plaintiff was authorized to have a second mat. At one point, he was allowed bed rest 24/7 for a short period of time. He was given printed directions for exercises to help reduce his pain. The efforts "taken to allay [Plaintiff's] pain, while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference to his medication needs." *Logan*, 119 F.3d at 650.

Plaintiff also alleges that Dr. Karas repeatedly avoided seeing him. (ECF No. 47-11 at 42). If Plaintiff, his family, or his lawyer made enough "noise," Plaintiff states that Dr. Karas "would finally just see me a bunch of times without doing no medical things." (*Id*). There is no prescribed number of times an inmate must be personally examined by a jail physician. Plaintiff's medical requests were responded to, his medical records were obtained and reviewed, and Dr. Karas or an advanced practice nurse (APN) made changes in his medication when determined to be medically necessary.

With respect to his psychological issues, Plaintiff was provided with antipsychotic medication, medication to reduce anxiety, and medication to treat depression. Plaintiff was also seen by the "social worker" on several occasions to discuss his mental status. The summary

judgment record contends evidence indicating that Dr. Karas and the Defendant nurses treated Plaintiff on numerous occasions, chose medications keeping in mind their concerns over Plaintiff's history of drug abuse, and there is no indication that the medications were completely ineffective. There are no genuine issues of material fact as to whether Dr. Karas demonstrated deliberate indifference to Plaintiff's serious medical or psychiatric needs.

With respect Nurse Dockery, Nurse Harris, and Nurse Walker, Plaintiff testified that they appeared to be blocking him from seeing Dr. Karas. (ECF No. 47-11 at 44-46). The evidence shows, however, that they coordinated Plaintiff's care, his records were frequently reviewed by an APN who had the training and authority to prescribe medications and/or order changes in medication, and Plaintiff was seen by Dr. Karas, although not as frequently as he would have liked. Whether the nurses should have acted sooner in referring Plaintiff to Dr. Karas or should have referred Plaintiff more frequently, is at most a question of negligence. *Hartsfield v. Colburn*, 491 F.3d 394, 398 (8th Cir. 2007)("Whether [Dr.] Ludwig should have acted sooner, instead of waiting for Hartsfield to submit [a second] request, is at most a question of negligence"). Moreover, Plaintiff has made only this generalized allegation that the nurses were keeping him from seeing Dr. Karas and has not ascribed any specific acts to these nurses.

With respect to Nurse Dockery, Plaintiff also asserts that she took him off Fioricet, even though it had been prescribed to him at the ASH and Dr. Karas, because it was not on their formulary. (ECF No. 47-11 at 44-45). Moreover, in his affidavit Dr. Karas stated "Fioricet can have an interaction with Hydrocortisone that lowers Hydrocortisone levels and could cause a life threatening adrenal crisis." (ECF No. 47-12 at 7). In sum, there is no evidence of deliberate indifference on the part of Nurse Dockery, Nurse Harris or Nurse Walker.

With respect to Nurse Hughes, Plaintiff testified Nurse Hughes would respond to his requests and grievances and "appeared to have some significant control over my treatment." (ECF No. 47-11 at 46). When asked what influence he thought Nurse Hughes had, Plaintiff testified "[t]he ability to keep me from seeing the doctor and to stop my sick call requests from getting to where they needed to go." (*Id.* at 46-47). Plaintiff based this on the fact that he did not get the answer he wanted which was to see Dr. Karas. (*Id.* at 47). There is no evidence that Plaintiff's requests and grievances were not reviewed by medical personnel. There is no requirement that the doctor review each request or grievance. There is no evidence of deliberate indifference on the part of Nurse Hughes.

Moreover, with respect to the alleged delays in treatment, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). Additionally, an inmate who complains of a delay in medical care, must provide verifying medical evidence in the record to establish the detrimental effect of the delay, to succeed on his claim. *Laughlin v. Schriro*, 430 F.3d 905, 929 (8th Cir. 2005). Plaintiff has put no such evidence in the record. Indeed, Plaintiff indicates in his deposition that he is not receiving the medication or treatment he believes is necessary in his current place of incarceration. He is only receiving Effexor and Hydrocortisone. (ECF No. 47-11 at 6).

Plaintiff also brings an official capacity claim against Sheriff Helder. An official capacity claim is considered a claim against the employing government agency; here Washington County. *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). To establish Washington County's liability, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d

814, 817 (8th Cir. 2009)(citation omitted).  To show the existence of an unconstitutional policy, Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  To show the existence of an unconstitutional custom, Plaintiff must show:  (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that he was injured by acts pursuant to the governmental custom, *i.e.,* that the custom was the moving force behind the constitutional violation.  *Johnson v. Douglas Cnty. Medical Dep't.*, 725 F.3d 825, 828 (8th Cir. 2013).

Plaintiff suggests the following establish an official capacity claim:  the failure to send with, or arrange for, his medication when Plaintiff is transferred to another location; the fact that it takes days for him to receive medication when transferred back to the WCDC; allowing the facility doctor and nurses to substitute their judgment for that of specialists; and the failure to train officers to properly deal with people with mental illnesses.

When Plaintiff leaves the WCDC for another facility, medical staff are no longer in charge of Plaintiff's medical care.  Plaintiff has failed to point to any policy or custom of Washington County that contributed to the alleged violations of his constitutional rights.  His allegations related to his official capacity claims merely consist of a recitation of the ways he believes his constitutional rights were violated.  This is insufficient.

The medical defendants, Karas Medical Team, Dr. Karas, Nurse Veronica Dockery, Nurse Ken Hughes, Nurse Landon Harris, Nurse Regina Walker, and Sheriff Helder are entitled to summary judgment on this claim.

### (B).  Denial of Access to the Court Claim

**(1).  Relevant Facts**

On July 27, 2016, Plaintiff submitted a request asking for law library access and stated the policy of refusing access without a court order put an undue burden on inmates.  He indicated he wanted to do legal research to make sure his constitutional rights were being respected during his incarceration and to research his criminal case.  (ECF No. 47-3 at  42).  Sergeant Stanton replied that Plaintiff would need to "get permission from the judge."  (*Id*).

In March of 2017, Plaintiff submitted a request stating that he understood he needed a court order to be able to study the criminal law, case law, and medical standards.  (ECF No. 47-3 at 69).  He asked for assistance in obtaining a court order.  (*Id*).  In response, Sergeant Arnold advised the Plaintiff he would have to "go through the courts for a court order to go to the law library if that is what you are requesting.  You will need to contact your attorney or the courts about obtaining an order."  (*Id*).  Plaintiff maintains that "[t]his policy effectively prevented me from preparing, filing and prosecuting my lawsuit until I was no longer in their custody.[37]"  (ECF No. 49 at 5).

According to Corporal Mulvaney, it is the policy of the WCDC that "all detainees shall have reasonable access to the courts through counsel whether appointed or retained, and in the event,  counsel has not been retained or appointed, the inmate should have reasonable access to the law library materials."  (ECF No. 47-1 at 3).  The WCDC does not have a law library. "Detainees must obtain legal assistance through their attorneys, from others outside the facility, or obtain an order directing that they be transported to the Washington County Law Library which is in the Washington County Courthouse."  (*Id*).  Plaintiff testified that Sheriff Helder was aware of

---

[37] This lawsuit was filed on November 13, 2017.

the policy denying access to the law library unless the inmate had a court order.  (ECF No. 62 at 1).

### (2).  Analysis of Denial of Access to the Courts Claim

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (emphasis added).  This right extends to an inmate's opportunity to challenge his sentence, directly or collaterally, and to challenge his conditions of confinement.  *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008).  The right does not require a state to enable prisoner to *discover* grievances and to *litigate effectively* once in court.  *Lewis v. Casey*, 518 U.S. 343, 354 (1996)

Plaintiff contends the WCDC's policy of requiring a court order to access the offsite library effectively denies him access to the Courts.  "[R]estricted access to the law library is not per se denial of access to the courts."  *Twyman v.* Crisp, 584 F.2d 352, 357 (10th Cir. 1987).  However, constitutional violations have been found where an inmate had no direct physical access to a law library and inmate law clerks assigned to assist them had "little or no legal experience, formalized training, or supervision by attorneys."  *Walters v. Thompson*, 615 F. Supp. 330, 338-39 (N.D. Ill. 1985).  While the Court concludes the WCDC's restriction denied Plaintiff the ability to research issues related to his conditions of confinement, the right set forth in *Bounds* was narrowed by *Lewis*, 518 U.S. at 351-52.

In *Lewis*, the Supreme Court held that an inmate has no standing to pursue an access claim unless he can demonstrate he suffered prejudice or actual injury because of the prison officials' conduct.  *Id.*  Thus after *Lewis*, "[t]o prove a violation of the right of meaningful access to the

courts, a prisoner must establish [1] the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, [2] which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'" *Hartsfield*, 511 F.3d at 831 (citations omitted). "Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996) (citation omitted).

Plaintiff has made no such showing in this case. Defendants are entitled to summary judgment on this claim.

### (C). Failure to Protect Claim

**(1). Relevant Facts**

On February 18, 2016, Plaintiff was involved in an altercation with Detainee Jerry Richey. (ECF No. 47-8 at 1). Both detainees were examined by the nurse and found to be without serious injury. (*Id*). When Plaintiff was being moved to another cell, he advised Corporal Robinson that Detainee Richey was a thief. (*Id*). Plaintiff was advised that this did not given him the right to "start punching" Detainee Richey. (Id). Both detainees were given major disciplinaries for battery. (*Id*).

On February 29, 2016, while in Q-block, Plaintiff advised Deputy Paredes that he needed to be moved. (ECF No. 49 at 68). Deputy Paredes noted redness on Plaintiff's face around his eye. (*Id*). Deputy Paredes had Plaintiff step into the hall. (*Id*). Plaintiff reported that he had just been "jumped." (*Id*). Plaintiff indicated that the detainees made him log onto the kiosk and they read his grievances. (*Id*). The detainees then called Plaintiff a snitch and asked to talk to him in a

cell under the stairs.  (*Id*).  When Plaintiff entered the cell, he was hit in the back of the head, then the right eye, and then multiple times in the rib area of his right side.  (*Id*).

Deputy Paredes took pictures to document Plaintiff's injuries.  (ECF No. 49 at 68).  He was then taken to the nurse's station to be evaluated.  (*Id*).  When Deputy Paredes asked Plaintiff who assaulted him, Plaintiff replied that he did not want to be a snitch.  (ECF No. 47-11 at 62).  Plaintiff testified he did not really know the inmates' names.  (*Id.* at 63).  Plaintiff was relocated.  (ECF No. 49 at 68).

Plaintiff testified that he was relocated to R-block by Deputy Paredes.  (ECF No. 56 at 30).  Plaintiff asked not to be put in R-block because it was next to Q-block.  (*Id*).  Plaintiff testified he was told he either had to go into R-block or get into trouble and go to the hole.  (*Id*).  Plaintiff requested to be housed on the "other side" of the detention center.  (*Id*. at 30-31).  Plaintiff felt he was not given any choice and that he had to go into R-block.  (*Id*. at 31).

Plaintiff agreed that he basically got into a fight everywhere he was housed.  (ECF No. 56 at 31-32).  According to Plaintiff, there was a Mexican gang that was "convinced I had snitched on somebody. So, everywhere I went where they were, I was going to get beat up."  (*Id.* at 32).  This gang was concentrated in Q-block, R-block, and S-block.[38]  (*Id*)

Plaintiff argues that the Defendants Paredes, Velasco, and Skinkis knew he was a vulnerable inmate "prone to being victimized yet continuously placed me in dangerous situations causing me to be assaulted multiple times."  (ECF No. 62 at 2).   According to Plaintiff, this knowledge should have alerted them to the risk of harm to Plaintiff.  (*Id*).  Plaintiff further contends that the policy of putting mentally ill inmates in with violent inmates in cells without intercoms is dangerous and caused him to be assaulted.  (*Id*. at 3).

---

[38] Plaintiff was never housed in S-block.  (ECF No. 56 at  32).

On March 1, 2016, Deputy Parades was in A-pod control when a detainee "hit the button in R-block and said he need[ed] to be moved somewhere else." (ECF No. 49 at 69). The detainee was the Plaintiff. (*Id*). Deputy Parades pulled Plaintiff into the hallway and asked what had occurred. (*Id*). Plaintiff stated that multiple detainees called him a snitch. (*Id*). Plaintiff was told to go to cell R-11 at which time the detainees assaulted him. (*Id*). When Deputy Parades asked for names or descriptions of the detainees, Plaintiff replied that he did not want to be a snitch and get jumped again. (*Id*). Plaintiff testified that the one inmate was involved in the assaults in both Q-block and R-block. (ECF No. 56 at 32). Plaintiff did not know the inmate's name. (*Id*).

Deputy Parades noted a small cut and redness on Plaintiff's face. (ECF No. 49 at 69). The nurse was called to evaluate the Plaintiff. (*Id*). She indicated that other than the small cut on his right arm he did not have any injuries. (*Id*). Deputy Parades took pictures of the visible marks. (*Id*). Plaintiff was taken to the nurse's station to have the cut cleaned. (*Id*). While there, Plaintiff complained of pain on his right rib cage. (*Id*). The nurse examined the area and listened to Plaintiff's lungs and told Plaintiff it seemed to be minor. (*Id*). Plaintiff was then relocated to P-block in administrative segregation for his own safety. (*Id*. at 70).

Plaintiff testified that Deputy Paredes also responded when he was assaulted in T-block. (ECF No. 56 at 55). According to Plaintiff, he was assaulted by the same inmate who assaulted him in Q-block. (ECF No. 47-11 at 57). The inmate had been moved into T-block when jail personnel were separating other inmates. (*Id*). Plaintiff asserts that this inmate "goes around starting trouble." (*Id*).

On May 30, 2016, Plaintiff was involved in an altercation with Deputy Uriel Paredes. (ECF No. 47-8 at 10-14). Plaintiff was given a major disciplinary for battery and failure to obey verbal

orders of staff. (*Id*. at 11 & 13). He was found guilty and given twenty days in disciplinary segregation. (*Id*. at 13).

Jarrod Ketcher was moved into the same cell as the Plaintiff on June 10, 2016. (ECF No. 41 at 24). According to Plaintiff, he told Deputies Velasco and Skinkis that there would be problems between the two inmates. (*Id*); *see also* (ECF No. 47-3 at 31).

According to Deputy Velasco, as soon as Plaintiff's cell door was opened, he took his shirt off, said he did not want to share his cell with anyone, and said they would fight. (ECF No. 47-14 at 1). At the time, Deputy Velasco indicates Plaintiff had not even seen Ketcher's face. (*Id*). Deputy Velasco states he advised Plaintiff that Ketcher had to be housed with him because there was no other place to put him at the time. (*Id*).

Deputy Velasco indicates that Plaintiff preferred to be housed alone and had reacted similarly each time another inmate was put in the cell with him. (ECF No. 47-14 at 2). Deputy Velasco did not know of any time Plaintiff had fought with the any other inmate who was put in his cell despite his threats to do so. (*Id*). Plaintiff allowed Ketcher to enter the cell. (*Id*). According to Deputy Velasco, when Ketcher entered the cell he stated that "they were not going to fight." (*Id*). Deputy Velasco does not recall Plaintiff mentioning the New Aryan Nation gang in front of him. (*Id*). As the deputies closed the cell door, Plaintiff and Ketcher "were standing and talking beside the bunk and did not appear to have any problems with each other." (*Id*).

Deputy Velasco went back to the block several times and "neither inmate reported any further problems" and Deputy Velasco did not observe any problems. (ECF No. 47-14 at 3). When Ketcher was placed in the cell, Deputy Velasco "believed Hurlbut was only protesting to avoid sharing a cell as he had done many times before. When I placed Ketcher in the cell with Hurlbut,

I did not believe that Hurlbut was at risk of injury, particularly in light of Ketcher's statement that he was not going to fight with Hurlbut." (*Id*).

Plaintiff testified that Deputy Velasco took Ketcher's mat and pushed Plaintiff into the cell and held him against the wall. (ECF No. 47-11 at 50). Both Deputies Velasco and Skinkis assert the mat was not used in such a manner. Ketcher also agrees.

After Plaintiff was back in the cell, he states that Deputy Skinkis then pushed Ketcher into the cell and slammed the door. (ECF No. 47-11 at 50). Ketcher was not being violent, did not appear to be aggressive, and was not acting out of control when he was placed in the cell with the Plaintiff. Deputy Velasco stated that he checked on Plaintiff and Ketcher several times throughout his shift and there was no suggestion of antagonism between the two inmates. Plaintiff also testified that the two agreed to chill out, be peaceful and civil, and put it on the kiosk the next day that one of them needed to be moved. (*Id*).

Ketcher testified he was moved to administrative segregation as the result of being in a fight. (ECF No. 42 at 15); *see also* (ECF No. 47-13). He was put in a cell with Plaintiff. (ECF No. 42 at 15). According to Ketcher, Plaintiff told him that "he had problems with the New Aryan Empire and that [Ketcher] shouldn't be housed with him." (*Id*. at 16). Ketcher testified it was common knowledge that it was part of his organization. (*Id*). Ketcher recalled that Plaintiff told the officers that he did not want Ketcher in his cell and it would probably cause a problem. (*Id*. at 17-18). At some point, Plaintiff took his shirt off. (ECF No. 47-13 at 20).

Ketcher thought Plaintiff just did not want anybody who was Caucasian in his cell. (ECF No. 42 at 18). Ketcher told Deputy Velasco that Plaintiff did not want anybody in his cell and there were plenty of other cells. (*Id*. at 26). Ketcher stated Deputy Velasco needed "to talk to [his] sergeant and put me somewhere else." (*Id*). The officers then started talking disciplinary action.

(*Id*).  Ketcher believed he said something to Deputy Velasco about not intending to fight Plaintiff.  (*Id.* at 27).

Ketcher's recollection was that Deputy Velasco handed Plaintiff his mat advised Plaintiff to put his grievance on the kiosk.  (ECF No. 47-13 at 11-12).  Ketcher testified that Plaintiff was talking to other inmates through the cell door and complaining about Ketcher being in the cell.  (ECF No. 42 at 20).  Other inmates stated that Plaintiff should have "smashed" Ketcher.  (*Id*).  Ketcher felt he and his organization were "disrespected."  (*Id*).  Ketcher, however, did not believe that Plaintiff was trying to provoke him.  (*Id.* at 25).  Ketcher just believed Plaintiff wanted the cell to himself.  (*Id*).

Ketcher testified he knew he was going to assault the Plaintiff but did not want to do it in the enclosed cell.  (ECF No. 42 at 20).  Ketcher wanted everyone to see him assault the Plaintiff.  (*Id.* at  21).  The next day, when they were given their hour out of the cell, Plaintiff went straight to the kiosk and Ketcher assaulted him.  (*Id*).  Ketcher testified he came up behind the Plaintiff and "struck him in the head with my hand, as hard as I could, and didn't stop until he was on the ground, bloody."  (*Id.* at 22).  Ketcher was not wounded.  (*Id.* at 24).

On June 11, 2016, Plaintiff was involved in a fight with Ketcher.  (ECF No. 41 at 21).  Plaintiff had blood on his left sleeve and his left eye looked back.  (*Id*).  Ketcher's face was red.  (*Id*).  Medical staff checked the two inmates for injuries.  (*Id*).  Ketcher told Deputy Webb that "one of them needed to go.  If not, they were going to fight again."  (*Id*).  Ketcher was moved to a different cell.  (*Id*).

According to Plaintiff, he was sitting on the ground when Ketcher "snuck up behind me and attacked me.  Therefore, I stood up and defended myself until Ketcher['s a[ss]ault was over." (ECF No. 47-3 at 31).  Plaintiff submitted a video.  (ECF No. 74).  The video contains two separate

files each with a different camera angle. The first clip does not depict the fight. However, the clip froze at approximately 34 minutes as an officer was climbing the stairs to the second tier. The clip remained frozen until the end of the clip at 43 minutes. The second video clip depicts Hurlbut and Ketcher fighting. However, the fight was already in progress when the clip starts.

Deputy Webb charged both inmates with a major disciplinary. (ECF No. 41 at 21). Plaintiff was found not guilty because video evidence showed he was not the aggressor in the fight and his actions "were to defend against and stop" Ketcher. (*Id*. at 22).

Plaintiff asserts that he had problems with violence from other inmates during his incarceration at the WCDC. He states that "[i]t seemed I was always getting jumped." (ECF No. 49 at 3). Plaintiff indicates that "[m]ost of these incidents went unreported." (*Id.* at 4). Plaintiff asserts that "[t]here were times where the stress and anxiety got to me so bad, I would completely break down and lose touch with reality." (*Id.* at 3).

On September 6, 2016, Deputy Hill noted that Plaintiff had "a shaved spot with a fresh tattoo on his wrist." (ECF No. 47-8 at 21). Plaintiff's cell was searched. (*Id*). Detainee Buster Harrell was in the cell at the time. (*Id*). Deputy Hill asked if there was a tattoo gun. (*Id)*. Harrell handed Deputy Hill an envelope with a bread tie he was using as a tattoo gun, broken pencils, strings, and a piece of a County issued striped shirt. (*Id*). Deputy Jennings found a piece of a razor blade and saran wrap. (*Id*). Deputy Hill searched a cracker box filled with mail and found another tattoo gun consisting of an ink pen cartridge and a shank. (*Id*). Deputy Hill found another tattoo gun consisting of a pencil with what appeared to be a staple. (*Id*). Harrell stepped in front of Deputy Hill and lunges. (*Id*). Deputy Jennings grabbed Harrell. (*Id*). Plaintiff had just returned to the block from a disciplinary review and told Deputy Jennings to let go of Plaintiff's cell mate. (*Id*). Plaintiff and Harrell started fighting with Deputy Jennings. Deputy Hill "jumped up and

grabbed both Harrell and Hurlbut around the neck." (*Id*). Deputy Jennings took Plaintiff and Deputy Hill forced Harrell to the floor. (*Id*). Corporal Roy placed his tazer on the Plaintiff's back and told him to stop resisting or he would be tazed. (*Id.* at 22). Plaintiff complied and was handcuffed. (*Id*). Deputy Jennings charged Plaintiff with assault and failure to obey verbal orders of staff.

"Harrell then clinched his right fist and started to swing when [Deputy Hill] grabbed his arm and forced him to the floor." (*Id*). Corporal Roy told Harrell to quit resisting or he would be tazed." (*Id*). Harrell rolled over, was handcuffed, and then helped to his feet. (*Id*). Harrell became upset again when he saw Deputy Paredes going through the cracker box. (*Id*). He was taken to the floor again and then moved to the hallway. (*Id*). The nurse was called to evaluate both the Plaintiff and Harrell. (*Id*). Harrell was charged with disciplinary violations. (*Id*).

With respect to Lieutenant Foster, Plaintiff testified he was "over the shift for the incidents with the inmates that were assaulting" him. (ECF No. 62 at 47). Plaintiff believed Lieutenant Foster was involved in moving him to the blocks in which Plaintiff was assaulted. (*Id*). Specifically, Plaintiff testified that Lieutenant Foster was "either . . . making the moves, telling them to make the moves, or he was over the shift and generally responsible for the people making the moves." (*Id*).

### (2). Analysis of Failure to Protect Claim

Prison officials have a duty, under the Eighth Amendment,[39] to protect prisoners from violence at the hands of other prisoners. *See Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir. 1998). However, not "every injury suffered by one prisoner at the hands of another . . . translates

---

[39] The Eighth Circuit applies the same Eighth Amendment analysis to actions brought by pretrial detainees and those brought by convicted prisoners. *See e.g., Crow v Montgomery*, 403 F.3d 598, 600 (8th Cir. 2005).

into constitutional liability for prison officials responsible for the victim' s safety." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

To prevail on his failure to protect claim, Plaintiff must satisfy a two-prong test. He must demonstrate that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm;" and (2) prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted). The first prong is an objective requirement to ensure the deprivation of a constitutional right is sufficiently serious. *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010). "The deprivation is objectively, sufficiently serious, under the first requirement when the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal punctuation marks and citations omitted).

The second prong, however, is subjective requiring Plaintiff show the official "both knew of and disregarded 'an excessive risk to inmate's health or safety.'" *Holden*, 663 F.3d at 341 *(quoting Farmer,* 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted). Plaintiff "need not show 'that a prison official acted or failed to act believing that harm actually would befall an inmate, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Nelson*, 603 F.3d at 447 *(quoting Farmer*, 511 U.S. at 842). "Moreover, 'in order to have a viable deliberate indifference claim, a plaintiff is *not* required to

allege and prove that the defendant . . . specifically knew about or anticipated the precise source of the harm.'" *Id.* (*quoting Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007)).

Prior to the assault, there had been no previous incidents or disputes between Plaintiff and Ketcher or the New Aryan Empire. There is no evidence in the record suggesting that Ketcher had been involved in other altercations or was the aggressor in any prior assaults. In any event, even if such evidence existed, "[a]n inmate's history of violence alone in insufficient to impute to prison official's subjective knowledge of the inmate's danger of harm to other inmates." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011)(citation omitted). Moreover, it is recognized that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

There was evidence that Plaintiff has been involved in three prior altercations with inmates. On two of those occasions, Plaintiff refused to identify the inmates involved. Plaintiff testified that he was victim in numerous other altercations that went unreported. Plaintiff was also involved in an altercation with Deputy Paredes and with Deputy Jennings. Plaintiff testified that you could not submit something in writing "every single that everybody is going to be your enemy, it's all the time." (ECF No. 47-11 at 54). At various times, Plaintiff was housed in administrative segregation for his safety.

Plaintiff did not tell Deputies Velasco or Skinkis that he felt threatened by Ketcher. Rather, Plaintiff told them he and Ketcher would fight if they put Ketcher in the cell. (ECF No. 47-11 at 49). At this point, Plaintiff testified he was threatened with a disciplinary if he did not allow Ketcher into his cell. (*Id*). In response, Plaintiff took his shirt off and said they were going to fight if the officers pushed Ketcher in the cell. (*Id*). Plaintiff also stated Ketcher was his enemy because he was an "Aryan prospect" and "just wanted to beat me up to impress his Aryan friends

that he's going to beat up a snitch." (*Id.* at 52). Plaintiff testified he had met Ketcher when they both were in population and that Ketcher was bragging that he was going to beat Plaintiff up. (*Id*). Plaintiff, however, did not report this other than verbally telling "the police" that Ketcher "better stay away from" him. (*Id*. at 53.).

Plaintiff maintains all the Constitution requires is that he inform jail officials there would be a problem if Ketcher was placed in his cell. This is clearly not the law. Inmates do not get to pick and choose who they are confined with; nor does an inmate get to dictate that he be housed by himself because he was involved in prior altercations. These types of decisions are left to jail officials so long as the inmate's constitutional rights are not being violated. There is evidence that Plaintiff had a history of protesting when other inmates were put in his cell and preferred to be housed by himself.

The question is "whether, based on the facts as alleged, the defendants recklessly disregarded an objectively serious risk of harm to [Plaintiff] by placing [Ketcher] in the same room." *Nelson*, 603 F.3d at 447. Here, there is no evidence Plaintiff was incarcerated under conditions posing a substantial risk of serious harm or that the Deputies Velasco and Skinkis were deliberately indifferent to Plaintiff's health or safety prior to the attack. Deputies Velasco and Skinkis are entitled to summary judgment.

With respect to Deputy Parades, Plaintiff's claim is based on the fact that Deputy Parades placed him in R-block after the altercation in Q-block. (ECF No. 47-11 at 55). Plaintiff did not want to be housed in R-block because it was next to Q-block. (*Id*). Plaintiff testified he was told he had to either go to R-block or the hole. (*Id*). Plaintiff chose R-block. (*Id*). However, Plaintiff believed he should have been moved to the other side of the jail. (*Id*).

This is insufficient to suggest that Deputy Parades knew that R-block was not going to be a safe place to house the Plaintiff or that he acted with deliberate indifference towards Plaintiff's safety. As discussed above, Plaintiff does not get to dictate where he will be housed. Deputy Parades is entitled to summary judgment.

With respect to Lieutenant Foster, Plaintiff testified he was over the shift for the incidents involving inmates assaulting him. (ECF No. 62 at 47). Plaintiff also believed Lieutenant Foster was involved in determining where Plaintiff should be housed. (*Id*).

Supervisors are not liable under § 1983 based on a respondeat superior theory. *Howard v. Adkison*, 887 F.2d 137, 137 (8th Cir. 1989). A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation "or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 761 (8th Cir. 2003)(citation omitted). Here, other than the fact that Lieutenant Foster is one of the shift supervisors, there is nothing in the summary judgment record to suggest he made any decisions on where Plaintiff should be housed or who he should be housed with. Nor is there any evidence that Lieutenant Foster's corrective inaction constitutes deliberate indifference towards Plaintiff's right to be free from attack by fellow inmates. Lieutenant Foster is entitled to summary judgment.

Plaintiff also asserts an official capacity claim. When asked to describe the jail's custom or policy, Plaintiff testified that "[w]hen you make a verbal report of a possible fight to an officer, they should immediately do something to stop it, or at least report it to their supervisor." (ECF No. 47-11 at 58). Further, Plaintiff testified that if he said there was "going to be a fight with me

and this guy," the deputy should definitely tell his supervisor and "see what to do about that." (*Id*).

As discussed above in connection with the official capacity claim against Sheriff Helder, Plaintiff must show that a policy or custom of Washington County was the moving force behind the violation of Plaintiff's constitutional right. *See Brewington v.* Keener, 902 F.3d 796, 800-01 (8th Cir. 2018)(liability on an official capacity claim exists only if the execution of a county policy or custom caused the injury). Here, Plaintiff sets forth what he believes the policy of the WCDC should be. He does not ascribe the constitutional violations to any existing policy or custom. Sheriff Helder is entitled to summary judgment.

### (D).  Unconstitutional Conditions of Confinement Claim

### (1).  Relevant Facts

According to Corporal Mulvaney, the WCDC "housing areas are configured such that each pod is set up with open barracks or smaller cells on the perimeter of the pod and then each has a day room where inmates have sufficient space to have recreation activities." (ECF No. 47-1 at 2). The day room has an intercom for use by inmates. (*Id.* at 2-3). "Deputies are assigned to perform random and regular checks of each pod throughout the day, at least one per hour. In addition, deputies are stationed in pod control areas where they have constant surveillance through cameras in each pod." (*Id.* at 3).

The Facility Supervisor may make the decision to place a detainee in administrative segregation "on the basis of:  1) a request for segregation by the detainee; 2) observations or reports from officers of persistently disruptive or potentially disruptive behavior; 3) a report [from] the facility physician or nurse; 4) apparent need for protection; or 5) recommendation of Judge, Prosecutor, or arresting agency." (ECF No. 47-1 at 3).

Plaintiff indicates he "spent month after unending month in solitary confinement or on disciplinary segregation" with no privileges. (ECF No. 48 at 4-5). He asserts he was "[n]ever given special consideration for my mental illness, even in disciplinary hearings." (*Id*). Plaintiff also notes that when he was on disciplinary segregation he did not even get his double mat prescription to help alleviate his chronic pain. (*Id*. at 5).

Plaintiff's assignment to administrative segregation was reviewed on August 22, 2016 and September 5, 2016 and it was determined he should remain there due to his own safety. (ECF No. 47-8 at 17, 20). On November 8, 2016, Plaintiff requested a move to administrative segregation. (*Id*. at 25). He was told he would be moved as soon as space became available. (*Id*). On November 23, 2016, Plaintiff's status was reviewed, and it was noted he had "problems adjusting in general population and . . . requested to be kept in ASEG status as a result." (*Id*. at 26). On December 7, 2016, Plaintiff's status was again reviewed. (*Id*. at 27). It was determined that Plaintiff could remain in administrative segregation due to his problems adjusting to general population. (*Id*). On January 6, 2017, Plaintiff's administrative segregation was reviewed, and Plaintiff was left in segregation due to limited housing options. (*Id*. at 31). The same conclusion was reached on January 21, 2017. (*Id*. at 32). On February 21, 2017, it was determined Plaintiff should remain in administrative segregation because he was on strong psychiatric medication, he had assaulted an officer, and his behavior was unpredictable and constituted an officer safety risk. (*Id*. at 33). On March 24, 2017, Plaintiff's housing was reviewed, and it was determined he should stay in administrative segregation pending the medical examination. (*Id*. at 36).

On January 2, 2017, Plaintiff complained of a leak in his cell that caused black mold to begin growing on the walls. (ECF No. 47-3 at 55). He said he believed the inmates were getting sick because of the leaking water and mold. (*Id*).

On March 22, 2017, Plaintiff submitted a grievance noting the public restroom was "filthy with used toilet tissue, trash, pubic hair, etc. This is a Hepatitis risk and probably other diseases too. Please have it scrubbed clean and disinfected asap." (ECF No. 47-3 at 70). In response, he was told the bathrooms were cleaned daily. (*Id*). He was also told he could ask an officer for cleaning supplies. (*Id*).

On May 7, 2017, Plaintiff submitted a grievance stating there were no intercoms in the cells with solid doors. (ECF No. 47-3 at 76). He asserted this was unconstitutional because there was no way for him to "hail an officer" should an emergency arise. (*Id*). In response, Plaintiff was told that regular jail checks were performed, and he could speak to an officer then. (*Id*). Plaintiff replied that was not adequate because the officers were hardly ever in there and when they are there they do not listen to anybody. (*Id*). Plaintiff said they needed to install intercoms and doors with bars. (*Id*). He was told that the jail was in compliance with the Arkansas Jail Standards. (*Id*).

**(2). Analysis of Unconstitutional Conditions of Confinement Claim**

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.[33] U.S. Const. amend. VIII. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The Eighth Amendment prohibits punishments that

---

[33] The Eighth Circuit has consistently applied the Eighth Amendment to conditions of confinement claims brought by pretrial detainees and convicted inmates. *See e.g., Davis v. Oregon Cnty., Missouri*, 607 F.3d 543, 548 (8th Cir. 2010)("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment")(internal quotation marks and citation omitted).

deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996). Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. Prison conditions claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

To state an Eighth Amendment claim, the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the detention facility that created a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. The deliberate indifference standard involves both an objective and subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 2 (1992) (The objective component is "contextual and responsive to contemporary standards of decency")(quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Brown v. Nix*, 33 F.3d 951, 954-55 (8th Cir. 1994). The subjective component "requires proof of a reckless disregard of a known risk." *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)(citation omitted).

Plaintiff maintains that his confinement in administrative segregation resulted in his being locked up twenty-three hours a day and not being allowed to have his mat during the day. He maintains these conditions adversely impacted both his physical and mental health.

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life' s necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they

have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'"  *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*quoting Wilson v. Sieter*, 501 U.S. 294 (1991)).  Confinement to administrative segregation does not constitute an Eighth Amendment violation.

Similarly, Plaintiff's exposure to black mold because of a leak in the cell and the filthy condition of the "public restroom" are insufficient to establish an Eighth Amendment violation. With respect to the leak, the inmates were provided with blankets to soak up the water and a maintenance order was completed.  With respect to the public restroom, Plaintiff does not deny that it was cleaned daily or that he could have requested cleaning supplies when it became dirty or unsanitary during the day.

Plaintiff's final contention is that it was unconstitutional for Defendants to confine inmates to cells that had solid metal doors and no intercoms.  Plaintiff maintains this made it virtually impossible to notify the guards in the event of an emergency.  In fact, Plaintiff states the only way you could attempt to notify the guards was to repeatedly kick the cell door to make enough noise to get their attention.  While Defendants maintain the guards made physical rounds in addition to guards manning the control area, Plaintiff suggests this did not occur on any regular basis.

Plaintiff's claim fails.  The lack of intercoms is not sufficiently egregious in that it does not deprive the inmates of a single identifiable human need.  Moreover, it is undisputed that the guards were present when meals were distributed, when trays were picked up, when medication was passed, and when inmates were given their hour out of the cell.  Defendants are entitled to summary judgment on this claim.

### (E).  Denial of Access to the Grievance Procedure Claim

**(1).  Relevant Facts**

The WCDC requires that all requests and grievances be submitted in writing.  (ECF No. 47-1 at 4).  "Grievances must be made promptly after the incident has occurred.  Procedures are in place for review, investigation, and response to grievances, as applicable."  (*Id*).  Plaintiff maintains his grievances were not promptly addressed, were frequently forwarded to others, the answers were incomplete, and he was not given the relief he asked for.

**(2).  Analysis of Denial of Access to the Grievance Procedure Claim**

"Inmates do not have a constitutionally protected right to a grievance procedure.  Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the grievance procedure is not actionable under § 1983."  *Lombolt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002)(denial of grievances does not state a substantive constitutional claim).  "Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts."  *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1981).  Plaintiff was not denied access to the courts.  Defendants are entitled to summary judgment on this claim.

### (F).  Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity.  *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless there is a violation of a constitutional right the Defendant is entitled to qualified immunity).

## V.    CONCLUSION

For the reasons stated, the Court **ORDERS** that:

1.    Plaintiff's Motion for Partial Summary Judgment (ECF No. 41) is **DENIED.**

2. Plaintiff's Motion for Summary Judgment (ECF No. 49) is **DENIED.**

3. Defendants' Motion for Summary Judgment (ECF No. 49) is **GRANTED.**

This case is hereby **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED** this 4th day of January, 2019.

/s/ *P. K. Holmes III*
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE